## IN THE UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF GEORGIA
## BRUNSWICK DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA and STATE OF GEORGIA, | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Civil Action No. <u>2:18-cv-78</u> |
| MIRACLE HOME CARE, INC.; MIRACLE ADULT DAY CARE, INC.; MIRACLE TRANSPORTATION; SHASHICKA TYRE-HILL; and DARLENE JACKSON, | ) ) ) ) ) ) | |
| Defendants. | ) ) | |

## THE GOVERNMENT'S COMPLAINT
## FOR DAMAGES UNDER THE FALSE CLAIMS ACT

The United States of America and the State of Georgia (the "Government"), by and through the undersigned, bring this action for treble damages and civil penalties under the False Claims Act ("FCA"), as amended, 31 U.S.C. §§ 3729–3733, the Georgia False Medicaid Claims Act ("GFMCA"), O.C.G.A. § 49-4-168, *et seq.*, and common law remedies against the Defendants in the above-captioned action and allege as follows:

## INTRODUCTION

1.     From at least January 1, 2012 through January 29, 2018, Miracle Home Care, Inc., Miracle Adult Day Care, Inc., Miracle Home Care Agency, and Miracle Transportation ("Miracle" or "Miracle Entities"); under the leadership of Defendants

1

Shashicka Tyre-Hill and Darlene Jackson, (collectively the "Defendants") have submitted false claims to Georgia Medicaid ("Medicaid") for non-emergency transportation and adult day health services that were never rendered and by systematically falsifying documents to mask their fraud.

2.     As a result of this conduct, and as described below, Defendants submitted or caused the submission of thousands of false or fraudulent claims to Medicaid for services that were either not performed or were not reimbursable under material Medicaid requirements. Defendants violated the FCA and GFMCA because they knowingly, as that term is defined by the FCA and GFMCA: (a) presented or caused to be presented false or fraudulent claims for payment or approval to the Georgia Medicaid program by submitting claims for payment for services that were not performed as represented; (b) presented or caused to be presented false or fraudulent claims for payment or approval to the Georgia Medicaid program by falsely certifying that claims for payment complied with Georgia Medicaid Policies and Procedures material to payment; (c) made, used, or caused to be made or used false records or statements material to payment; and (d) conspired to commit the violations described in (a) – (c) above. As a result of these false claims, the United States of America and the State of Georgia suffered extensive damages.

3.     Defendants' fraud upon the Government causes a continuing and substantial injury to the Government and its citizens who contribute to the Medicaid program.

4.      The Government is entitled to treble damages and civil penalties as authorized under the FCA, the GFMCA, and the common law theories of payment by mistake, unjust enrichment, money had and received, and common law fraud.

## JURISDICTION

5.      This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 since this civil action arises under laws of the United States, in particular, 31 U.S.C. §§ 3729, 3730.

6.      This Court has supplemental subject-matter jurisdiction over the claims brought under the GFMCA pursuant to 28 U.S.C. § 1367 and 31 U.S.C. § 3732(b) since funds paid by the State of Georgia arise from the same transactions or occurrences and are so related to the claims brought under the FCA that they form part of the same case or controversy.

7.      This Court has personal jurisdiction over Defendants because Defendants prepared, submitted, and conspired to submit false claims and false records in the Southern District of Georgia, because Defendants' principal places of business are located within the jurisdiction of this Court, and because Defendants Shashicka Tyre-Hill and Darlene Jackson reside within the Southern District of Georgia.

## VENUE

8.      Venue is proper in this district under 28 U.S.C. §§ 1391(b),(c), and 1395, and under 31 U.S.C. § 3732(a). Defendants can be found, reside, and transact business within the Southern District of Georgia.

## PARTIES

9.      Plaintiff, the United States of America, acting through the Department of Health and Human Services ("HHS"), administers the Grants to States for Medical Assistance Programs pursuant to Title XIX of the Social Security Act, 42 U.S.C. § 1396 *et seq.* (the "Medicaid Program").

10.     Plaintiff, the State of Georgia, acting through the Georgia Department of Law ("Georgia") brings this action pursuant to the Attorney General's authority under the GFMCA. The Georgia Department of Community Health administers the Georgia Medicaid program.

11.     Defendant Miracle Home Care, Inc. is located in Brunswick, Glynn County, Georgia, and is a Georgia corporation. Miracle Home Care, Inc.'s principal office is located at 650 Scranton Road, Brunswick, Georgia 31525, and can be served through its registered agent Shashicka Tyre-Hill.

12.     Defendant Miracle Adult Day Care, Inc. is located in Brunswick, Glynn County, Georgia, and is a Georgia corporation. Miracle Adult Day Care, Inc.'s principal office is located at 650 Scranton Road, Suite J, Brunswick, Georgia 31520, and can be served through its registered agent Shashicka Tyre-Hill.

13.     Defendant Miracle Transportation is the fictitious or d/b/a name under which Miracle Home Care, Inc. operated its non-emergency transportation service business within the Georgia Medicaid program. Miracle Transportation is not a formally registered business enterprise of Shashicka Tyre-Hill with the Georgia Secretary of State. However, Tyre-Hill's contracts and correspondence with Georgia's

non-emergency transportation regional broker, LogistiCare, routinely made reference to Miracle Transportation. The Government will serve Miracle Transportation through Shashicka Tyre-Hill as she is the point of contact and CEO listed for Miracle Transportation within the contracts with LogistiCare.

14.     Defendant Shashicka Tyre-Hill is the owner of Miracle Home Care, Inc. and Miracle Adult Day Care, Inc., and oversees the operations of both entities. Defendant Shashicka Tyre-Hill is domiciled in the State of Georgia and resides in Brunswick, Georgia.

15.     Defendant Darlene Jackson is an employee of Miracle Home Care, Inc. and Miracle Adult Day Care, Inc. According to the Georgia Secretary of State website, Jackson serves as the Secretary for both Miracle Home Care, Inc. and Miracle Adult Day Care, Inc. Jackson also manages the operations of Miracle's adult day health facility. Defendant Darlene Jackson is domiciled in the State of Georgia and resides in Brunswick, Georgia.

## THE FALSE CLAIMS ACT

16.     The FCA provides, in pertinent part, that:

(a)(1) . . . [A]ny person who —

> (A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

> (B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim; [or]

> (C) conspires to commit a violation of subparagraph (A), [or] (B); . . .

* * *

5

is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990, plus 3 times the amount of damages which the Government sustains because of the act of that person. . . .

(b)(1) [For purposes of this section,] the terms "knowing" and "knowingly" (A) mean that a person, with respect to information —

> (i) has actual knowledge of the information;

> (ii) acts in deliberate ignorance of the truth or falsity of the information; or

> (iii) acts in reckless disregard of the truth or falsity of the information;

and (B) require no proof of specific intent to defraud.

31 U.S.C. § 3729(a), (b). *See also* 28 C.F.R. § 85.5 (detailing current civil penalties of not less than $11,181 and not more than $22,363 for each claim in violation of the FCA).

17.     The GFMCA provides, in pertinent part, that:

(a) Any person who —

> (1) Knowingly presents or causes to be presented to the Georgia Medicaid program a false or fraudulent claim for payment or approval;

> (2) Knowingly makes, uses, or causes to be made or used a false record or statement material to a false or fraudulent claim; [or]

> (3) Conspires to commit a violation of paragraph (1), [or] (2); . . .

* * *

shall be liable to the State of Georgia for a civil penalty of not less than $5,500 and not more than $11,000 for each false or fraudulent claim, plus three times the amount of damages which the Georgia Medicaid program sustains because of the act of such person. . . .

O.C.G.A. § 49-4-168.1(a).

6

## THE MEDICAID PROGRAM

18.     The Medicaid Program was created in 1965 as part of the Social Security Act, which authorized federal grants to states for medical assistance to low-income, blind, or disabled persons, or to members of families with dependent children or qualified pregnant women or children. The Medicaid Program is jointly financed by the federal and state governments. The Centers for Medicare and Medicaid Services ("CMS"), an agency of HHS, administers the Medicaid program on the federal level. Within broad federal rules, each state determines eligible groups, types and range of services, payment levels for services, and administrative and operating procedures.

19.     The Georgia Medical Assistance Program became effective in October 1967.

20.     On July 1, 1977, the Georgia Department of Medical Assistance (the "Division") was created to administer the Medicaid program. In 1999, the Department of Community Health ("DCH") was created to administer healthcare programs in Georgia, including Medicaid. The Georgia Department of Medical Assistance became a division within DCH.

21.     In order to qualify for federal funds for Medicaid expenditures, the Georgia Medicaid program is required to implement a State Plan containing certain specific minimum criteria for coverage and payment of claims, as set forth by the federal Medicaid statute. 42 U.S.C. §1396a.

22.     DCH is responsible for the administration and supervision of the Medicaid program. O.C.G.A. §§ 49-4-140, *et seq.* grants DCH the authority to

"establish such rules and regulations as may be necessary or desirable in order to execute the state plan and to receive the maximum amount of federal financial participation available in expenditures made pursuant to the state plan[.] O.C.G.A. § 49-4-142(a). Georgia regulations authorize and require that DCH "publish the terms and conditions for receipt of medical assistance in Policies and Procedures manuals for each of the categories of service authorized under the State Plan." Ga. Comp. R. & Regs. R. 350-1-.02(3). These manuals are disseminated to providers enrolled in the applicable category of service, and amendments thereto are effective "as specified by the Department at the time of dissemination." *Id.* Thus, DCH sets the rules for the provision of medical services to Georgia Medicaid recipients, the circumstances in which providers can become enrolled in Georgia Medicaid, and how Georgia Medicaid reimburses providers for these claims.

23.    Individuals who receive medical assistance from Medicaid are commonly referred to as "recipients" or "beneficiaries."

24.    Individuals and entities who want to be reimbursed by Medicaid for services provided to beneficiaries must first enroll with Medicaid by submitting an application to DCH, or one of its authorized contractors. If the applicant meets the requirements for enrollment, she is then eligible to be paid for qualifying services. An individual or entity which has enrolled in the Medicaid program is known as a "provider."

25.    Medicaid providers submit claims for payment to states, which pay the claims and obtain the federal portion of the payment from accounts that draw on the

United States Treasury. After the end of each calendar quarter, the state submits to CMS a final expenditure report, which provides the basis for adjustment to the quarterly federal funding amount (to reconcile the estimated expenditures to actual expenditures). 42 C.F.R. §§ 430.0–430.30 (2018). The federal share of Medicaid expenditures varies by state and can fluctuate annually.

26.     The most basic condition for reimbursement by Medicaid is to have actually provided the service for which payment was made. Ga. Dep't of Cmty Health, Policies and Procedures for Medicaid/PeachCare for Kids, Part I, § 106(J) ("[Provider agrees to] neither bill the Division for any services not performed or delivered in accordance with all applicable policies, nor submit false or inaccurate information to the Division relating to provider costs, claims, or assigned certification numbers for services rendered."); Ga. Dep't of Cmty. Health, Policies and Procedures for Medicaid/PeachCare for Kids, Part I, § 106(L) ("[Provider agrees that] [s]ubmission of a claim by a provider or his agent, acceptance of a Remittance Advice, or acceptance of claim payment constitutes verification that the services were performed by that provider (or under his direct supervision, if allowed by the Division.")); Ga. Dep't of Cmty. Health, Policies and Procedures for CCSP General Services, Part II, § 1001. ("[P]roviders can only bill the Department [of Community Health] for services provided.")

27.     To prove that services were provided, and to prove that such services complied with all conditions imposed by federal and state law, providers must maintain records related to the provision of services. Ga. Dep't of Cmty. Health,

Policies and Procedures for Medicaid/PeachCare for Kids, Part I, § 106(R); Ga. Dep't of Cmty. Health, Policies and Procedures for CCSP General Services, Part II, § 601.5. Maintaining sufficient records is a condition for reimbursement by Medicaid.

28.     Providers are required to maintain records in a manner that is secure, accurate, confidential, and accessible. *Id.* Importantly, providers must make all records available to the Government as requested. *Id.*; *see also*, Ga. Dep't of Cmty. Health, Policies and Procedures for Medicaid/PeachCare for Kids, Part I § 106(S)(detailing provider requirements to respond in a timely manner for requests for records from qualified state and federal agenices).

29.     Providers are not allowed to alter patient records, even in an effort to correct an error. Failure to comply with medical records requirements subject providers to recoupment of payment. Ga. Dep't of Cmty. Health, Policies and Procedures for Medicaid/PeachCare for Kids, Part I § 106(FF).

**Medicaid's Community Care Services Program**

30.     Georgia Medicaid offers an umbrella of services under the Community Care Services Program ("CCSP"). CCSP is designed to assist individuals who are older and/or functionally impaired to continue living in their own homes and communities as an alternative to nursing home placement. Ga. Dep't of Cmty. Health, Policies and Procedures for CCSP General Services, Part II, § 600.

31.     Providers wishing to enroll in the CCSP program must meet the General Participation requirements outlined in the Part I Policies and Procedures for

Medicaid/PeachCare for Kids manual and must also meet additional participation criteria detailed in the Part II Policies and Procedures for CCSP General Services.

32.     All CCSP providers are required to maintain clinical records related to the provision of CCSP services in accordance with accepted professional standards and practice and within the standards outlined by the policy manuals. Providers must maintain clinical records for members for a minimum of six years from the last date of service. Ga. Dep't of Cmty. Health, Policies and Procedures for CCSP General Services, Part II, § 601.5; Ga. Dep't of Cmty. Health, Policies and Procedures for CCSP General Services, Part II, § 606.4; Ga. Dep't of Cmty. Health, Policies and Procedures for CCSP General Services, Part II, § 606.19.

33.     In order to ensure that services are provided to beneficiaries effectively and safely, CCSP requires that all CCSP services be supervised by a Licensed Registered Nurse ("RN"). Ga. Dep't of Cmty. Health, Policies and Procedures for CCSP General Services, Part II, § 606.17.

34.     Failure to adequately document RN supervision subjects a provider to payment recoupment by DCH because RN supervision is a material requirement of CCSP services. Ga. Dep't of Cmty. Health, Policies and Procedures for CCSP General Services, Part II, § 607.1(B); Ga. Dep't of Cmty. Health, Policies and Procedures for CCSP General Services, Part II, § 901(B); Ga. Dep't of Cmty. Health, Policies and Procedures for CCSP General Services, Part II, § 902(F).

11

## Medicaid's Adult Day Health Services

35.     One of the services offered to eligible beneficiaries under the CCSP umbrella is Adult Day Health services. Adult Day Health provides nursing services, medical supervision, health, therapeutic, and social service activities in a community-based day program. Ga. Dep't of Cmty. Health, Policies and Procedures for CCSP General Services, Part II, § 600.2.

36.     Medicaid beneficiaries eligible for CCSP services may receive Adult Day Health services if that service is determined to be appropriate for the member by the regional care coordinator.

37.     Adult Day Health targets beneficiaries who need physical assistance and a more structured environment and who would be at risk of institutional placement if appropriate intervention is not provided. Ga. Dep't of Cmty. Health, Policies and Procedures for Adult Day Health Services (ADH) (CCSP), Part II, § 1101.1

38.     Adult Day Health providers must comply with all General CCSP provider requirements including clinical record maintenance, record retention, and supervision requirements.

39.     In addition to all record requirements detailed above, Adult Day Health records must include a Member Service Record Form and Member Activity Participation Record (included as Appendices A and B). Ga. Dep't of Cmty. Health, Policies and Procedures for Adult Day Health Services (ADH) (CCSP), Part II, § 1103.6.

12

40.     For Adult Day Health programs which provide "Therapeutic Activities," the provider must maintain an Activity Participation Record (Appendix B), and that record must be completed and reviewed at least monthly by the supervising RN. Ga. Dep't of Cmty. Health, Policies and Procedures for Adult Day Health Services (ADH) (CCSP), Part II, § 1103.4(D).

41.     An RN with a current license to practice in the State of Georgia must supervise all services. Supervisory visits must be conducted at least monthly. While the Adult Day Health center may employ a Licensed Practical Nurse ("LPN"), the LPN must still be under the direct supervision of an RN. Ga. Dep't of Cmty. Health, Policies and Procedures for Adult Day Health Services (ADH) (CCSP), Part II, § 1103.5.

## Medicaid's Non-Emergency Transportation Program

42.     In accordance with 42 C.F.R. § 431.53, the Non-Emergency Transportation program ("NET") offers transportation services for eligible Medicaid members who have no other means of transportation to secure necessary health care services.

43.     Georgia Medicaid covers transportation to and from health care services that are covered under the State's plan.

44.     As of October 1, 1997, the Division contracted the administration, scheduling, and payment of NET services to three (3) contractors covering five (5) regions in Georgia. These contractors are known as NET "Brokers." Brokers are paid

a capitated rate by Medicaid for each eligible Medicaid member residing in their region.

45.     Brokers, in turn, sub-contract with NET providers to cover transportation services for eligible Medicaid beneficiaries in their assigned regions. Payments to NET providers by Brokers are made, at least in part, by the funds and money provided to the Brokers by the Georgia Medicaid program.

46.     Since 1997, DCH has not enrolled individual transportation providers. Instead, transportation companies interested in providing services to Medicaid members must contact the Broker for the region in which he or she wishes to provide transportation services and submit an enrollment application to the Broker.

47.     While Brokers are responsible for contracting with individual transportation providers, DCH requires Brokers to comply with certain program requirements. Ga. Dep't of Cmty. Health, Policies and Procedures for NET Brokers, Part II, § 100.1.

48.     Included among these generalized requirements are obligations that all transportation providers must be registered with the Georgia Public Service Commission to provide transportation services, and Brokers must have model service contracts with providers which meet minimum requirements established by DCH. *Id.*

49.     From the capitated payments made to the Broker by DCH, the Broker will pay transportation providers for services according to the service agreements. The Broker is obligated under its duties to DCH to only pay providers for services

actually rendered. Ga. Dep't of Cmty. Health, Policies and Procedures for NET Brokers, Part II, § 100.2(1).

50.     The Brokers, in turn, set the specific contractual requirements relevant to specific NET providers.

51.     At all times relevant to this Complaint, the Broker for the East and Southwest regions of the State has been LogistiCare.

## FACTUAL BACKGROUND

### Miracle's Operations and Ownership

52.     Defendants Miracle Home Care, Inc. and Miracle Adult Day Care, Inc. are in the business of providing a number of healthcare and healthcare-related services.

53.     Miracle Home Care, Inc. and Miracle Home Care Inc., d/b/a Miracle Home Care Agency are Defendants' enrolled Medicaid provider names. Miracle Home Care, Inc. provides Personal Support Services as well as Adult Day Health Services through the CCSP program.

54.     In addition, Defendants previously operated the NET provider business known as Miracle Transportation, which was contracted through Medicaid NET Broker LogistiCare.

55.     Defendants Miracle Home Care, Inc. and Miracle Adult Daycare, Inc. are entirely owned by Defendant Shashicka Tyre-Hill.

56.     The fictitious business names and d/b/as Miracle Home Care Agency and Miracle Transportation are legally indistinguishable from Miracle Home Care, Inc.

15

57.     Miracle Home Care, Inc.; Miracle Adult Day Care, Inc.; Miracle Home Care, Inc. d/b/a Miracle Home Care Agency; and Miracle Home Care, Inc. d/b/a Miracle Transport are hereinafter collectively referred to as "Miracle" or the "Miracle Entities."

58.     Defendant Shashicka Tyre-Hill owns and operates the Miracle Entities.

59.     Defendant Darlene Jackson, who is Defendant Shashicka Tyre-Hill's mother, oversees the day-to-day operations of Miracle's adult day health facility. Defendant Darlene Jackson also was involved in the Miracle Entities' transportation business.

60.     Brian Jackson, who is Defendant Darlene Jackson's husband, handles much of the Miracle Entities' billing to Medicaid.

**Miracle's Enrollment in Medicaid**

61.     On April 10, 2006, Miracle Home Care Agency enrolled in the Georgia Medicaid program by submitting a provider enrollment application to the Division.

62.     By enrolling as a Medicaid provider, Miracle Home Care Agency acknowledged that it was required to comply with DCH Rules and Regulations as a condition for participation in the program.

63.     During enrollment, Shashicka Tyre-Hill, as administrator for Miracle Home Care Agency, certified that she had read the Part I, II, and III manuals applicable to the category of service for which she sought enrollment.

64.     Miracle Home Care Agency executed what is known as a Statement of Participation between itself and DCH. A signed Statement of Participation is

required to be considered an enrolled provider. *See* Ga. Dep't of Cmty Health, Policies

and Procedures for Medicaid/PeachCare for Kids, Part I, Defintions, "58) Provider"

("Provider means any individual or entity furnishing Medicaid services pursuant to

a Statement of Participation (provider agreement) with the Division.").

65.   Among the express understandings in the Statement of Participation

are:

> Claims Submissions: Certification of Claims.   Provider shall submit
> claims for Covered Services rendered to eligible Medicaid recipients in
> the form and format designated by the Department.   For each claim
> submitted by or on behalf of the Provider, Provider shall certify each
> claim for truth, accuracy, and completeness, and shall be responsible for
> research and correction of all billing discrepancies without cost to the
> Department."   ¶2(B)(4)(A)

> Provider shall maintain in an orderly manner and ensure the
> confidentiality of all original source documents, medical records,
> identifying recipient data, and any copies thereof, as may be necessary
> to fully substantiate the nature and extent of all services provided. ¶
> 2(B)(4)(B).

> ….By submitting claims for reimbursement, Provider certifies that
> Covered Services were rendered in the amount, duration, scope and
> frequency indicated on the claims. ¶2(B)(4)(C)

Department of Community Health Division of Medical Assistance, Statement
of Participation, DMA-002 (Rev. 04/03).

66.   The Statement of Participation also contains provider obligations

regarding Recipient Records, and states, in part: "Records shall be retained for a

minimum of five (5) years from the date of service, or longer as required by state or

federal law. The Recipient Records provisions in the Statement of Participation also

obligate the provider to turn over records upon request to the "Department, its agent,

and any authorized agent including but not limited to the U.S. Department of Health

17

and Human Services, the State Attorney General's Office or their authorized representatives."

67.   Additionally, providers who receive funds electronically execute what's known as the "Georgia Department of Community Health Electronic Funds Transfer Agreement" ("EFT Agreement").

68.   The EFT Agreement also includes certifications/acknowledgements by the provider, particularly that "[p]rovider certifies by such acceptance [of medical assistance payments] that Provider presented the claims for the services shown on the Remittance Advice issued by the Department, and that the services were rendered by or under the supervision of the Provider. Provider understands that payment will be from federal and state funds and that any falsification, or concealment of a material fact, may be prosecuted under federal and state laws."

69.   Miracle Home Care Agency's enrollment paperwork and certifications were signed by Defendant Shashicka Tyre-Hill.

70.   Miracle Home Care, Inc. initially billed Medicaid for Personal Support Services only.

71.   Around 2013, Defendants expanded their operations to include Adult Day Health services.

72.   In 2014, Defendant Shashicka Tyre-Hill registered Defendant Miracle Adult Day Care, Inc., though according to Medicaid provider enrollment records, Miracle Adult Day Care, Inc. has never enrolled as a separate Medicaid provider.

73.     Claims submitted to Medicaid's fiscal intermediary for payment continued to be processed under the name of Miracle Home Care, Inc. for all Adult Day Health services. The Provider Numbers associated with those services are 927869260D and 927869260E.

74.     On information and belief, Defendant Miracle Adult Day Care, Inc. may have some operational function related to Miracle's adult day health operations, even though Miracle Home Care, Inc. is the entity that submits claims to Medicaid for reimbursement.

75.     In or around February of 2014, Defendants began billing for transportation services to Medicaid NET Broker LogistiCare. Claims submitted by Defendants for payment were under the name "Miracle Transportation." Shashicka Tyre-Hill's contract with LogistiCare lists the "Provider" name as "Miracle Home Care d/b/a Miracle Transportation."

76.     In total, Defendants, through the Miracle Entities, have claimed and received payment for at least $9,452,053.65 from the Medicaid program since 2012.

## The Government's Investigation

77.     The United States served a series of Civil Investigative Demands ("CIDs") under the authority of 31 U.S.C. § 3733 on Defendants on May 16, 2017.

78.     The CIDs sought the production of documents and interrogatory responses from Defendant Miracle Home Care, Inc., and testimony from Defendant Shashicka Tyre-Hill as well as several other Miracle employees.

79.    The CID served on Miracle Home Care, Inc. specifically demanded the production of all documents relating to Miracle's adult day care program, including all attendance sheets, medical records, monthly activity reports, and care plans for all adult day care patients. All such records were the types of records Miracle was required to retain under Medicaid policies and procedures.

80.    Despite Medicaid policies that require such records to be kept in a manner that make them available no later than fourteen (14) days from the request, Miracle Home Care, Inc. produced documents demanded in the CID, along with a one-page response to the seven interrogatories, to the Government on November 29, 2017—more than six months after the CIDs were served, and more than five months after the deadline for compliance.

81.    Accompanying the November 29, 2017 production of documents, Defendant Shashicka Tyre-Hill signed a Certificate of Compliance on behalf of Defendant Miracle Home Care, Inc. In the Certificate of Compliance, Shashicka Tyre-Hill declared in a notarized document submitted to the United States, "I hereby certify that all the materials required by that Civil Investigative Demand that are in the possession, custody or control of the entities to whom the Demand is directed have been submitted to the designated False Claims Act Investigators."

82.    Two weeks later, on December 12, 2017, Defendant Shashicka Tyre-Hill and Jocelyn Jenkins, a Miracle employee, gave testimony pursuant to CIDs served on those two individuals.

83.   During Defendant Shashicka Tyre-Hill's testimony, the Government inquired into many attendance sheets and activity reports that showed Medicaid beneficiaries attending the adult day health program far less frequently than what Defendant Miracle Home Care, Inc. billed to Medicaid. The Government also pointed out that Miracle Home Care, Inc. failed to produce documents to support a significant number of adult day health services for which Medicaid had paid Defendants. In response to these inquiries, Shashicka Tyre-Hill claimed that Miracle maintained adult day care files for just three years, and that after three years, Miracle shreds all files using six shredders that Miracle maintains onsite.

84.   Despite having already affirmed that Defendants had produced all documents in their possession relating to the provision of adult day health services, Defendants (through counsel) informed the Government that additional records existed that would substantiate Defendants' adult day health billings in the form of additional, previously unproduced, monthly logs that it wished to produce.

85.   Because such records were required by Medicaid policies to be available within two (2) hours for an on-site visit and no later than fourteen (14) days of a written demand, the Government stated that such records should be immediately produced given the already substantial delay which had occurred. Defendants, however, did not immediately produce the additional monthly logs. Instead, Defendants mailed the previously unproduced monthly logs on January 29, 2018— approximately seven weeks after stating, on December 12, 2017, that additional logs existed.

## DEFENDANTS' SCHEME

86.     Defendants engaged in at least two schemes to defraud Medicaid by submitting claims for services that were either not performed or were not reimbursable under Medicaid policies and procedures, but for which Defendants intentionally sought reimbursement.

### False Adult Day Health Claims

87.     Since around 2014, Defendants Miracle Home Care, Inc. and Miracle Home Care, Inc. d/b/a Miracle Adult Daycare, Inc.—by and through the direct and indirect involvement of both Defendants Shashicka Tyre-Hill and Darlene Jackson— have operated one or more adult day health facilities purportedly within the purview of Medicaid's CCSP program. Defendants submitted and caused the submission of claims to Medicaid for these services.

88.     For Medicaid beneficiaries who require daily social and therapeutic care, the Medicaid program pays the adult day health provider a capitated payment for every day a beneficiary receives eligible services.

89.     Paramount to maintaining adequate proof to justify claims submitted to Medicaid by Defendants are the attendance logs (Appendix A) and monthly activity reports (Appendix B) outlined by Medicaid's CCSP Policies and Procedures manuals.

90.     Defendant Shashicka Tyre-Hill and Defendant Darlene Jackson instructed Defendants' employees to mark Medicaid beneficiaries as present and receiving adult day care services when those beneficiaries were not in attendance at any Miracle facility.

91.    Defendants, or employees of Defendants, falsified records to show that Medicaid beneficiaries received services that were not actually rendered.

92.    Defendant Miracle Home Care, Inc.—as the enrolled provider—submitted claims to the Government for adult day health services that were not rendered, and for which Defendants altered records that materially falsified the truthfulness of the services provided.

93.    Defendants Miracle Home Care, Inc.; Miracle Adult Day Care, Inc.; Shashicka Tyre-Hill; and Darlene Jackson submitted and caused the submission of those falsified records to the Government in response to the CIDs issued by the United States.

94.    Relying on the truthfulness of Defendants' claims, Medicaid paid Defendants for services that were not rendered and for services for which Defendants falsified documents. Attached as "Exhibit 1," which is incorporated by reference, is an illustrative list of the adult day health claims currently known to the Government that Defendant Miracle Home Care, Inc. billed to Medicaid that were false, fraudulent, or otherwise not reimbursable but for which Miracle received payment.

95.    In addition to Defendants' falsification of documents prior to the Government's investigation, Defendants also falsified documents during the Government's investigation.

Miracle Home Care's initial records production did not substantiate the vast majority of services billed to Medicaid for adult day health services

96.    The documents produced by Miracle Home Care, Inc. on November 29, 2017 (the "Initial Production") were falsified at the direction of Shashicka Tyre-Hill

and Darlene Jackson to reflect services that were not actually rendered, according to multiple former employees and beneficiaries.

97.    A comparison of the Initial Production to claims submitted to Medicaid for adult day health services reflected a large discrepancy in what the records could justify as opposed to what was billed to Medicaid.

98.    In fact, according to the Government's review of the Initial Production, Defendants lacked sufficient records to support approximately 95% of their adult day health claims to Medicaid for which they received money.

99.    Of the approximately 5% of Defendants' claims for which some documentation was provided in the Initial Production, former employees and beneficiaries have provided evidence that even those records were falsified.

<u>*Patient D.H.*</u>

100.    For example, in the Initial Production, Defendants provided records of Medicaid beneficiary, and Miracle patient, D.H. for April 2016.

101.    These records showed that D.H. attended Miracle's adult day health facility for nine (9) days in April 2016.

102.    Defendants, however, claimed to Medicaid that D.H. was present in Miracle's adult day health facility for twenty-one (21) days in April 2016. Defendants caused the submission of an electronic claim, ICN Number 2216189015118, to Medicaid for 21 days for which Medicaid paid Defendants $1,059.45 for services allegedly provided to D.H.

*Patient K.Y.*

103.   Another example is Medicaid beneficiary, and Miracle patient, K.Y.'s records for July 2014.

104.   K.Y.'s July 2014 records show that K.Y. was not in attendance for a single day that month. Defendants submitted documents to the Government showing absent codes for K.Y. for many days and no days marked "present" in Appendix A for July 2014. Appendix B for K.Y. for July 2014 was blank except for K.Y.'s name, the month and the year.

105.   Defendants, however, submitted claims to Medicaid for twenty-one (21) days of adult day health services to K.Y. for July 2014. Electronic claims data, ICN Number 2214220005649, reflects that Miracle received $1,324.47 for these 21 claimed days of service.

*Patient E.S.*

106.   A final example is Medicaid beneficiary, and Miracle patient, E.S.'s records and billing for March 2017.

107.   E.S.'s March 2017 Appendix A record shows that E.S. was present for three (3) days at Miracle's adult day health facility. Defendants did not produce E.S.'s Appendix B for March 2017.

108.   Defendants, however, submitted claims to Medicaid for eighteen (18) days of service to E.S. for March 2017. For these electronic claims, ICN Numbers 2217062014759, 2217069007765, 2217076008465, and 2217083010964, Miracle received $908.10.

<u>Miracle Home Care's records were altered to show additional services
at some point between November 29, 2017 and January 29, 2018</u>

109.   The records produced by Defendants on January 29, 2018 (the
"Supplemental Production") contained records that had been altered since the Initial
Production.

110.   Specifically, many documents included in the Initial Production were re-
produced in the Supplemental Production with the original markings and signatures,
but with checkmarks and notations added in to attempt to justify a greater number
of services. The Government believes these falsifications occurred sometime between
November 29, 2017 and January 29, 2018.

111.   Defendants, or someone with access to Defendants' adult day health
patient files, added or directed others to add these new checkmarks and notations in
an effort to materially mislead Government investigators about the number of
services actually rendered at Defendants' adult day health facilities.

<u>*Patient D.H.*</u>

112.   For example, in the Initial Production, Defendants provided records of
Medicaid beneficiary, and Miracle patient, D.H. for May 2016. The records consisted
of both an Appendix A and Appendix B. Both of these records showed D.H. attended
Miracle Adult Day Care for eighteen (18) days during that month.

113.   Defendants re-produced Appendix A for patient D.H. for May 2016 in
their Supplemental Production. The Supplemental Production contained the original
nurse's certifying signature and original checkmarks for May 2016, but it also
contained checkmarks for an additional four (4) days. In other words, someone added

checkmarks to D.H.'s May 2016 Appendix A between the Initial Production and the Supplemental Production to show not just eighteen (18) days, but twenty-two (22) days.

114.   Nothing in the record indicated when or who modified the record from the original produced as required by Medicaid Policies & Procedures.

115.   Miracle submitted claims for twenty-two (22) days of service to Medicaid for patient D.H. for May 2016.

### *Patient R.W.*

116.   Another example is the April 2017 record for Medicaid beneficiary, and Miracle patient, R.W. The Initial Production contained notations on both Appendix A and Appendix B showing six (6) days of attendance for the entire month, and on Appendix A Defendants checked the "Absent Code" column for R.W. on six (6) days. The remaining days were left blank.

117.   By contrast, the Supplemental Production documented R.W. as present for twenty (20) days in April 2017. Of note, the Supplemental Production-version of R.W.'s April 2017 Appendix A still contains the six "Absent Code" column check marks, but with "Full day" column checkmarks added to those very same days. In other words, Defendants' Supplemental Production-version of R.W.'s April 2017 Appendix A shows R.W. as both present and absent on several days. Defendants also added checkmarks to R.W.'s 2017 Appendix B.

118.   Nothing in the record indicated when or who modified the record from the original produced as required by Medicaid Policies & Procedures.

119.   Miracle submitted claims for twelve (12) days of service to Medicaid for patient R.W. for April 2017.

*Patient K.Y.*

120.   One additional example is Medicaid beneficiary, and Miracle patient, K.Y.'s records for April 2016. Defendants' Initial Production showed that K.Y. was present at Miracle's adult day health facility for seventeen (17) days in April 2016 according to Appendix A, and sixteen (16) days according to Appendix B.

121.   Defendants' Supplemental Production, however, contained the original checkmarks on K.Y.'s April 2016 Appendix A, but also had four (4) additional checkmarks that had been added, so that Appendix A reflected that K.Y. was present for twenty-one (21) days. The Supplemental Production-version of K.Y.'s April 2016 Appendix B had not been altered, and still showed K.Y. as present for just sixteen (16) days.

122.   Nothing in the record indicated when or who modified the record from the original produced as required by Medicaid Policies & Procedures.

123.   Miracle submitted claims for twenty (20) days of service to Medicaid for patient K.Y. for April 2016.

**Miracle Home Care's records were altered to add certifying nurse's signatures at some point between November 29, 2017 and January 28, 2017**

124.   In addition, Defendants, or someone with access to Defendants' adult day health patient files, added or directed others to add signatures of supervising nurses purporting to certify the accuracy of the records. As stated previously, the

supervision of a licensed RN is a material requirement to receive payment for services under the CCSP program.

125.    Among the falsified items were the signatures of RN supervisors during time periods such individuals were not working for Miracle.

126.    For example, Defendants submitted numerous records dated from 2015 containing the signature of RN Sherri Kaylor as the certifying and supervising RN for adult day health services. Sherri Kaylor did not begin working for Defendants until May of 2017. The documents from 2015 containing her signature were clearly falsified.

### *Patient M.M.*

127.    One instance of the Sherri Kaylor alterations is the record of Medicaid beneficiary, and Miracle patient, M.M. for November and December 2015.

128.    Miracle did not produce any records showing M.M's attendance at Miracle adult day health facilities in November and December 2015 in the Initial Production.

129.    In the Supplemental Production, however, Defendants submitted documents that showed M.M. present at the adult day health facility for twenty (20) days in November 2015 and for twenty-two (22) days in December 2015. On those documents, Sherri Kaylor's signature appears at the bottom to certify the record. On M.M.'s November 2015 Appendix A, next to Sherri Kaylor's signature is the hand-written date "11 30 15," meaning the signature was from November 30, 2015. On Appendix A for M.M. for December 2015 is the hand-written date of "12 30 15,"

29

meaning the signature was from December 30, 2015. Since Sherri Kaylor did not work for Defendants in November and December of 2015, she could not have certified M.M.'s attendance for those months.

130.   Miracle submitted claims to Medicaid for fifteen (15) days of service in November 2015, ICN Numbers 2215310010183, 2215317013846, and 2215324011217, and for fifteen (15) days of service in December 2015, ICN Numbers 2215338010307, 2215345008857, and 2215352011408, for patient M.M.

*Patient R.W.*

131.   Another instance of the Sherri Kaylor alterations is the record of Medicaid beneficiary, and Miracle patient, R.W. for February, November, and December 2015.

132.   Miracle did not produce any records showing R.W.'s attendance at Miracle adult day health facility in February, November, and December 2015 in the Initial Production.

133.   In the Supplemental Production, however, Defendants submitted documents that show R.W. present at the adult day care facility for twenty (20) days in February 2015, for twenty (20) days in November 2015, and for twenty-two (22) days in December 2015. On those documents, Sherri Kaylor's signature appears at the bottom to certify the record and each purports to show the certification was done at or near the end of each such month.

134.   Miracle submitted claims to Medicaid for twenty (20) days of service in February 2015, ICN Numbers 2215037011003, 2215044014636, 2215051007846, and

30

2215058011328, ten (10) days of service in November 2015, ICN Numbers 2215310009587, 2215317013747, 2215324011064, and 2215331005722, and for eleven (11) days of service in December 2015, ICN Numbers 2215338010429, 2215352011341, 2215345008227, and 2216001003417, for patient R.W.

<u>Miracle Home Care's records conflict with each other</u>

135.    Even for documents only produced once, the Attendance Logs (Appendix A) and Activity Logs (Appendix B) routinely and materially conflicted with one another.

## *Patient J.C.*

136.    For example, records for Medicaid beneficiary, and Miracle, patient J.C., were not included in the Initial Production. The Supplemental Production, however, included records for J.C. for October 2014. The Government's review of J.C.'s file showed a material discrepancy. Appendix A claimed beneficiary J.C. attended Miracle's adult day health program on twenty-three (23) days in October 2014. Appendix B only reflected J.C.'s attendance and participation for nine (9) days for the exact same month.

137.    Miracle billed Medicaid for twenty-three (23) days for services allegedly provided to J.C. in October 2014.

## *Patient K.M.*

138.    Another example is the October 2016 records for Medicaid beneficiary, and Miracle patient, K.M. These records were part of the Initial Production, and were not re-produced as part of the Supplemental Production. Appendix A shows K.M. present for twelve (12) days in October 2016, yet Appendix B fails to document a

single day of attendance by K.M. in October 2016. Appendix A and Appendix B are signed by the same certifying nurse and dated on the same day.

139.   Miracle billed Medicaid for nineteen (19) days for services allegedly provided to K.M. in October 2016.

### *Patient C.J.*

140.   One similar example is the October 2016 records for Medicaid beneficiary, and Miracle patient, C.J. These records were not part of the Initial Production, but were produced for the first time as part of the Supplemental Production. Appendix A shows C.J. present for twelve (12) days in October 2016, yet Appendix B fails to document a single day of attendance by C.J. in October 2016. Appendix A and Appendix B are signed by the same certifying nurse and dated on the same day.

141.   Miracle billed Medicaid for twenty-one (21) days for services allegedly provided to C.J. in October 2016.

### *Patient R.W.*

142.   The February 2016 records for Medicaid beneficiary, and Miracle patient, R.W. combine many of the problems identified above.

143.   The Initial Production included records for R.W. for February 2016. Appendix A reflected that R.W. was present for four (4) days in February 2016, while Appendix B reflected that R.W. was present for just two (2) days that month. Specifically, Appendix A showed R.W. as present on February 4, 9, 11, and 17, 2016. Appendix B showed R.W. as present on February 17 and 24, 2016. In other words,

only one day, February 17, is marked to indicate presence of R.W. on both required appendices.

144.    The Supplemental Production included different records for R.W. for February 2016. Defendants re-produced the exact same version of Appendix B for February 2016, but added checkmarks to the Supplemental Production version of Appendix A so that it now shows attendance at Miracle's adult day health facility for thirteen (13) days that month; not four, as originally reflected.

145.    Defendants billed Medicaid for twelve (12) days for services allegedly provided to R.W. in February 2016.

* * *

146.    Because of Defendants' expansive falsification of documents, Defendants have prevented the Government from determining what services, if any, were actually rendered to Medicaid beneficiaries.

147.    The Government believes that Defendants submitted approximately 1,456 false claims to Medicaid in association with adult day health services.

148.    Defendants also created, used, or caused to be created or used more than one thousand false records in an effort to support Defendants' false claims.

149.    As a direct and foreseeable result of Defendants' conduct, the Government suffered damages in excess of $100,000.00 by paying for claims that were false or fraudulent in nature to Miracle.

**False Transportation Claims**

150.  From 2014 to August 2015, Defendants operated Miracle Transportation through a Transportation Agreement it executed with NET Broker, LogistiCare Solutions, LLC ("LGTC").

151.  The Transportation Agreement signed by Miracle Transportation required it to

      a.  Ensure compliance with all city, county, state, and federal requirements regarding licensing, certification, and insurance for all personnel and vehicles,

      b.  Only utilize drivers and vehicles that are registered with and pre-approved by LGTC to perform services,

      c.  Provide proof that all drivers and attendants have acceptable Motor Vehicle Reports, criminal background checks, and drug screen records, and

      d.  Drivers must meet certain minimum qualifications and are subject to initial and annual inspections for compliance.

152.  The Transportation Agreement, paragraph "m" states that providers shall establish and maintain records and related information for review for the period of the contract *and for a period of five years thereafter*. The information subject to this requirement includes vehicle records, driver and attendant records, *and all daily vehicle manifests, trip logs, and invoice documents.*

153.    Exhibit B to the Transportation Agreement specifies that "As a condition of payment, Provider must submit accurate invoices, including properly completed trip logs, to LGTC within 60 days of date of service. Time is of the essence with respect to providing prompt and accurate invoices. **No payments will be made for services performed by non-compliant drivers or vehicles, including drivers or vehicles that are not registered with LGTC to provide services.**" (emphasis in original).

154.    Exhibit B also contains a section called "Invoice Requirements" which requires the Provider to submit to LGTC once a week completed trip logs pertaining to the previous workweek, including the signatures of the applicable Participants. Improperly completed trip logs will be returned to the Provider and payment will be denied.

155.    Finally, Miracle Transportation's Agreement with LogistiCare contains Appendix D which provides detailed notice to Miracle about LogistiCare's Fraud, Waste, and Abuse practices.

156.    Defendant Shashicka Tyre-Hill is the signatory to the Transportation Agreement and all other documents relating to Miracle Transportation's enrollment in the NET program as a subcontracted service provider to LogistiCare.

157.    Despite Medicaid requirements that obligated Defendants to retain records relating to its provision of transportation services, Defendants retained no such records.

158.    In fact, Defendant Shashicka Tyre-Hill admitted, in testimony provided pursuant to a CID, that Defendants destroyed all of their transportation records when they ceased performing transportation services.

159.    This act alone is a material violation of the conditions for which Medicaid agrees to reimburse providers for services.

160.    By not maintaining any records, Defendants are ineligible to retain any funds provided by Medicaid for services because the Government cannot verify that such services were rendered.

161.    The Government, however, was able to obtain many copies of Defendants' transportation billings and documents created by Defendants in support of their transportation billings from LogistiCare.

162.    The Miracle documents obtained through LogistiCare show that an incomprehensible amount of fraud was perpetrated by Defendants.

163.    Defendants routinely billed Medicaid for transportation services that were not rendered, and created documents to falsely indicate that transportation services were rendered.

164.    Defendants claimed that Medicaid beneficiaries received transportation to and from Defendants' adult day health facility, when in reality neither service was rendered.

165.    Multiple former employees of Defendants stated that Miracle submitted false transportation claims and represented that transportation services were provided that never occurred.

166.   As part of their plan to submit claims to Medicaid for services not rendered, Defendants created, used, and caused to be created or used falsified documents to support their false claims.

167.   Miracle's claims submissions to LogistiCare had to identify the driver who performed the service in order to be reimbursed. According to LogistiCare records, Miracle Transportation had ten (10) drivers approved by LogistiCare to provide transportation.

168.   The Government's review of Defendants' transportation billings to LogistiCare show that 6,594 trips identified Keneshia Register as the driver performing the services. Register was one of the ten drivers enrolled with LGTC.

169.   The trips identifying Keneshia Register began on April 7, 2014 and continued to April 17, 2015. Many of these trips were either to or from one of Miracle's Adult Day Health facilities.

170.   However, Keneshia Register only worked part-time for Defendants for a few weeks in 2014, and documents provided by Defendants show that Keneshia Register logged just 17.5 total hours working for Defendants. Miracle paid Register a total of $157.50 for her services.

171.   LogistiCare paid Defendants $152,609.25 for the 6,594 trips that were purportedly performed by Keneshia Register. The funds paid by LogistiCare to Defendants came from money obtained from the Medicaid program according to LogistiCare's Broker agreement.

172.    The Government interviewed Register in 2017. When shown the thousands of Miracle trip logs with her name and signature, Keneshia Register confirmed that her signature had been forged and that whoever committed the forgeries even spelled her name incorrectly on a number of those documents.

173.    Register was also listed as the driver for 346 trips billed as provided to Medicaid beneficiary, B.M. As part of its investigation, the Government spoke to the mother of B.M., who stated that her daughter, B.M., was never transported by Miracle Transportation or any of the Defendants.

174.    Most of these trips were billed as either coming from or going to one of Miracle's Adult Day Health facilities. B.M.'s guardian confirmed that B.M. never attended the adult day health facility. Miracle never billed B.M. for adult day health services.

175.    For these 346 trips which were billed as being provided to a patient who Defendants never transported and were billed as provided by a driver who worked for Miracle for no more than a few weeks, Miracle received $7,605.31 from LogistiCare.

176.    A number of Miracle's transportation billings involved transporting Medicaid beneficiaries to and from Miracle's adult day health facility, yet Miracle's adult day health records show no attendance at the facility for the same day. In other words, Miracle's transportation and adult day health records do not match.

177.    In some situations, the records directly conflict. Multiple beneficiaries were billed for transportation services on dates they did not attend the adult day

health facility. Such claims include but are not limited to those claims included as Exhibit 2.

178.    Defendants' falsification of supporting documents is in violation of federal and state law.

179.    Because Defendant Miracle Home Care, Inc. did not maintain accurate supporting documentation for services legitimately rendered, Defendant Miracle Home Care, Inc. is not entitled to any of the funds claimed for transportation services.

180.    Miracle Home Care, Inc. claimed, and was paid for, 37,534 transports in the two years that it engaged in transportation services.

181.    The Government paid Defendant Miracle Home Care, Inc. $847,241.12 in funds derived from, at least in part, money belonging to the Georgia Medicaid program for NET services.

182.    The Government contends that the vast majority of these transportation claims were not rendered, were rendered by ineligible drivers, or were otherwise not rendered as billed to the program.

183.    Because of Defendants' falsification of documents, the Government is unable to determine whether any legitimate transportation services were rendered. The trip logs submitted to LogistiCare to substantiate services routinely contained false signatures of both riders and drivers. This intentional falsification makes such logs useless in attempting to separate legitimate services from those that are false in nature. Additionally, the claims data contains transport pick-up and drop-off times and numbers that are entirely impossible. The discrepancies include drivers driving

multiple vehicles at the same time, riders being picked up in different cities simultaneously, and drivers, such as Keneshia Register, being listed during time periods where they were not employed by Miracle. Examples of such trips are included as Exhibit 3.

184.    As a result of Defendants' false claims, submission of false records in support of false claims, and conspiracy to submit false claims, the Government has been injured and has suffered damages. Attached as Exhibit 4, which is incorporated by reference, is an illustrative list of the transportation claims currently known to the Government that Defendant Miracle Home Care d/b/a Miracle Transport billed to Medicaid that were false or fraudulent.

## COUNT I
## False Claims in Violation of 31 U.S.C. § 3729(a)(1)(A)

185.    Plaintiffs repeat and reallege each allegation of paragraphs 1 through 184 as if fully set forth herein.

186.    Defendants knowingly presented, or caused to be presented, false or fraudulent claims for payment or approval to the Government in violation of 31 U.S.C. § 3729(a)(1)(A).

187.    Defendant Miracle Home Care, Inc. submitted false claims to Medicaid for reimbursement for adult daycare and transportation services that were not actually rendered.

188.    Defendant Miracle Home Care, Inc. also submitted false claims to Medicaid that were not performed in compliance with conditions of payment material to Georgia Medicaid.

189.    These false claims were submitted at the direction of Defendant Shashicka Tyre-Hill, and involved adult daycare services provided by individuals associated with Defendant Miracle Home Care, Inc. and Defendant Miracle Adult Daycare, Inc.

190.    Defendants Miracle Home Care, Inc., Miracle Adult Daycare, Inc., Shashicka Tyre-Hill, and Darlene Jackson knew or should have known that the claims submitted by Defendant Miracle Home Care, Inc. were false or fraudulent.

191.    By virtue of the false or fraudulent claims, the United States suffered damages in an amount to be determined at trial, and is entitled to treble the amount of those damages under the False Claims Act, plus civil penalties of not less than $11,181 and up to $22,363 for each violation.

## COUNT II
## False Claims in Violation of O.C.G.A. § 49-4-168.1(a)(1)

192.    Plaintiffs repeat and reallege each allegation of paragraphs 1 through 184 as if fully set forth herein.

193.    Defendants knowingly presented, or caused to be presented, false or fraudulent claims for payment or approval to the Government in violation of O.C.G.A. § 49-4-168.1(a)(1).

194.    Defendant Miracle Home Care, Inc. submitted claims to Medicaid for reimbursement for adult daycare and transportation services that were not actually rendered, or were billed but were not eligible for payment for lack of compliance with a material condition, such as maintaining non-falsified supporting documentation.

195.   These false claims were submitted at the direction of Defendant Shashicka Tyre-Hill, and involved adult daycare services provided by individuals associated with Defendant Miracle Home Care, Inc. and Defendant Miracle Adult Daycare, Inc.

196.   Defendants Miracle Home Care, Inc., Miracle Adult Daycare, Inc., Shashicka Tyre-Hill, and Darlene Jackson knew or should have known that the claims submitted by Defendant Miracle Home Care, Inc. were false or fraudulent.

197.   By virtue of the false or fraudulent claims, the Government suffered damages in an amount to be determined at trial, and is entitled to treble the amount of those damages under the Georgia False Medicaid Claims Act, plus civil penalties of not less than $5,500 and up to $11,000 for each violation.

### COUNT III
### False Record or Statement in Violation of 31 U.S.C. § 3729(a)(1)(B)

198.   Plaintiffs repeat and reallege each allegation of paragraphs 1 through 184 as if fully set forth herein.

199.   Defendants knowingly made, or used, or caused to be made or used, false records or statements material to false or fraudulent claims for payment to the Government in violation of 31 U.S.C. § 3729(a)(1)(B).

200.   Defendants Miracle Home Care, Inc., Miracle Adult Daycare, Inc., Shashicka Tyre-Hill and Darlene Jackson submitted such false or fraudulent records or statements to the Government for the purpose of receiving or preserving payment for false or fraudulent claims.

201.   Miracle Home Care, Inc., Miracle Adult Daycare, Inc., Shashicka Tyre-Hill, and Darlene Jackson knew or should have known such records or statements to be false or fraudulent.

202.   The false records or statements were material to false or fraudulent claims. If Medicaid had known of the falsity of Defendants' representations, it would not have paid the claims.

203.   By virtue of the false records or statements material to false or fraudulent claims, the United States suffered damages in an amount to be determined at trial, and is entitled to treble the amount of those damages under the False Claims Act, plus civil penalties of not less than $11,181 and up to $22,363 for each violation.

## COUNT IV
## False Record or Statement in Violation of O.C.G.A. § 49-4-168.1(a)(2)

204.   Plaintiffs repeat and reallege each allegation of paragraphs 1 through 184 as if fully set forth herein.

205.   Defendants knowingly made, or used, or caused to be made or used, false records or statements material to false or fraudulent claims for payment to the Government in violation of O.C.G.A. § 49-4-168.1(a)(2).

206.   Defendants Miracle Home Care, Inc., Miracle Adult Daycare, Inc., Shashicka Tyre-Hill and Darlene Jackson submitted such false or fraudulent records or statements to the Government for the purpose of receiving or preserving payment for false or fraudulent claims.

207.   Miracle Home Care, Inc., Miracle Adult Daycare, Inc., Shashicka Tyre-Hill, and Darlene Jackson knew or should have known such records or statements to be false or fraudulent.

208.   The false records or statements were material to false or fraudulent claims.

209.   By virtue of the false records or statements material to false or fraudulent claims, the Government suffered damages in an amount to be determined at trial, and is entitled to treble the amount of those damages under the Georgia False Medicaid Claims Act, plus civil penalties of not less than $5,500 and up to $11,000 for each violation.

### COUNT V
### Conspiring to Make False Claims in Violation of 31 U.S.C. § 3729(a)(1)(C)

210.   Plaintiffs repeat and reallege each allegation of paragraphs 1 through 184 as if fully set forth herein.

211.   Defendants Miracle Home Care, Inc., Miracle Adult Daycare, Inc., Shashicka Tyre-Hill, and Darlene Jackson conspired to present false claims, or conspired to make or use a false record or statement material to a false claim, in violation of 31 U.S.C. § 3729(a)(1)(C).

212.   By virtue of the conspiracy to present false claims, or conspiracy to make or use a false record or statement material to a false claim, the United States suffered damages in an amount to be determined at trial, and is entitled to treble the amount of those damages under the False Claims Act, plus civil penalties of not less than $11,181 and up to $22,363 for each violation.

44

<u>**COUNT VI**</u>
<u>**Conspiring to Make False Claims in Violation of O.C.G.A. § 49-4-168.1(a)(3)**</u>

213.   Plaintiffs repeat and reallege each allegation of paragraphs 1 through 184 as if fully set forth herein.

214.   Defendants Miracle Home Care, Inc., Miracle Adult Daycare, Inc., Shashicka Tyre-Hill, and Darlene Jackson conspired to present false claims, or conspired to make or use a false record or statement material to a false claim, in violation of O.C.G.A. § 49-4-168.1(a)(3).

215.   By virtue of the conspiracy to present false claims, or conspiracy to make or use a false record or statement material to a false claim, the Government suffered damages in an amount to be determined at trial, and is entitled to treble the amount of those damages under the Georgia False Medicaid Claims Act, plus civil penalties of not less than $5,500 and up to $11,000 for each violation.

<u>**COUNT VII**</u>
<u>**Payment By Mistake**</u>

216.   Plaintiffs repeat and reallege each allegation of paragraphs 1 through 184 as if fully set forth herein.

217.   As a result of Defendants' claims to the Government for services allegedly provided to Medicaid beneficiaries, the Government paid Defendants certain sums of money.

218.   The Government paid Defendants money with the understanding that Defendants certified compliance with applicable Medicaid regulations, and conditioned on compliance with Medicaid regulations.

219.    The Government would not have paid Defendants an amount to be determined at trial but for the Government's mistaken belief that Defendants actually performed the services claimed.

220.    The Government's mistake was reasonable under the circumstances.

221.    By virtue of the Government's mistaken belief that Defendants actually performed the services claimed, the Government suffered injury.

## COUNT VIII
## Unjust Enrichment

222.    Plaintiffs repeat and reallege each allegation of paragraphs 1 through 184 as if fully set forth herein.

223.    By receiving payment for services not rendered, Defendants were unjustly enriched.

224.    The circumstances of Defendants' receipt of the funds at issue are such that, in equity and good conscience, Defendants are liable to account for and pay such amounts, which are to be determined at trial.

## COUNT IX
## Money Had and Received

225.    Plaintiffs repeat and reallege each allegation of paragraphs 1 through 184 as if fully set forth herein.

226.    Defendants have received money to which they are not entitled.

227.    Such money justly belongs to the Government.

228.    Defendants have refused to repay the money to the Government.

229.    Defendants are liable to the Government for an amount to be determined at trial.

## COUNT X
## Common Law Fraud

230.   Plaintiffs repeat and reallege each allegation of paragraphs 1 through 184 as if fully set forth herein.

231.   Defendants made material misrepresentations of fact with knowledge of, or in reckless disregard of, the truth of those representations in connection with claims for payment submitted by Defendants to the Government.

232.   Defendants intended that the Government rely upon the accuracy of the false representations.

233.   The Government made substantial payments of money in justifiable reliance upon Defendants' false representations.

234.   Defendants' actions caused the Government to be damaged in an amount to be determined at trial.

## PRAYER FOR RELIEF

WHEREFORE, the Government requests that judgment be entered in its favor and against Defendants as follows:

a.   On the First, Third, and Fifth Counts under the False Claims Act, and on the Second, Fourth, and Sixth Counts under the Georgia False Medicaid Claims Act, for the amount of the Government's damages, trebled as required by law, and such civil penalties as are required by law, together with all such further relief as may be just and proper.

b.   On the Seventh, Eighth, Ninth, and Tenth Counts, for the amount of the Government's damages for payment by mistake, unjust enrichment, money had and

received, and common law fraud, for the damages sustained and/or amounts by which

the Defendants were unjustly enriched or by which Defendants retained improperly

obtained monies, plus interest, costs, and expenses, and all such further relief as may

be just and proper.

**A Jury Trial is Requested.**

Dated: June 27, 2018

Respectfully submitted,

BOBBY L. CHRISTINE
UNITED STATES ATTORNEY

*/s/ Jonathan A. Porter*
JONATHAN A. PORTER
Assistant United States Attorney
Georgia Bar No. 725457
U.S. Attorney's Office
Post Office Box 8970
Savannah, Georgia 31412
Telephone: (912) 652-4422
Email: Jonathan.Porter@usdoj.gov

CHRISTOPHER M. CARR
ATTORNEY GENERAL
STATE OF GEORGIA

*/s/ James P. Mooney*
JAMES P. MOONEY
Georgia Bar No. 940402
Assistant Attorney General
Office of the Attorney General
Georgia Medicaid Fraud Control Unit
200 Piedmont Ave., S.E.
West Tower, 19th Floor
Atlanta, Georgia 30334
Telephone: (404) 656-5242
Email: JMooney@law.ga.gov